ORIGINAL

U.S. DISTRICT COURT
FILED
DEC 2 0 2006
S.D. OF N.Y. W.P.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

HENRY L. RITELL,                         :

                    Plaintiff,           :

        - against -                      :

THE VILLAGE OF BRIARCLIFF MANOR, THE     :
BOARD OF TRUSTEES OF THE VILLAGE OF
BRIARCLIFF MANOR, and MICHAEL S. BLAU,   :
Village Manager, in his individual and
official capacities,                     :

                    Defendants.          :

- - - - - - - - - - - - - - - - - - X

**ECF CASE**

06 Civ. 14249(WCC)

**OPINION
AND ORDER**

06, 0049

**A P P E A R A N C E S :**

FEERICK LYNCH MacCARTNEY, PLLC
96 South Broadway
P.O. Box 612
South Nyack, New York 10960

DENNIS E.A. LYNCH, ESQ.
MARY E. MARZOLLA, ESQ.                   - and -

        Of Counsel

LENTZ, STEPANOVICH & BERGETHON
448 Viking Drive, Suite 370
Virginia Beach, Virginia 23452

JOHN G. STEPANOVICH, ESQ.
ISAIAH KALINOWSKI, ESQ.                  - and -

        Of Counsel

ALLIANCE DEFENSE FUND
15333 N. Pima Road, Suite 165
Scottsdale, Arizona 85260

BENJAMIN W. BULL, ESQ.
GLEN LAVY, ESQ.
BRIAN W. RAUM, ESQ.

        Of Counsel         **Attorneys for Plaintiff**

                           **Copies E-Mailed to Counsel of Record**

USDC SDNY WP

MICROFILM
DEC 2 0 2006

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

**A P P E A R A N C E S :   (continued)**

WORMSER, KIELY, GALEF & JACOBS LLP
**Attorneys for Defendants**
399 Knollwood Road, Suite 205
White Plains, New York 10603

CLINTON B. SMITH, ESQ.
LESTER D. STEINMAN, ESQ.
LYNN E. WEINIG, ESQ.
SEAN T. O'LEARY, ESQ.

      Of Counsel

**CONNER, Senior D.J.:**

Plaintiff, Henry L. Ritell, brings this action against defendants, the Village of Briarcliff Manor (the "Village") and Michael S. Blau, Manager of the Village, pursuant to 42 U.S.C. § 1983 for violation of the Free Speech and Free Exercise Clauses of the First Amendment to the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment, as well as violations of the corresponding provisions of the New York State Constitution. Specifically, plaintiff takes exception to the Village's erection of a menorah adjacent to a lighted, naturally-growing evergreen tree in a public park to celebrate the holiday season, contending that it constitutes an impermissible endorsement of Judaism.[1] Plaintiff desires to erect a creche in the area of the menorah at his own expense, but has been prohibited from doing so. He now seeks a judgment declaring defendants' acts unconstitutional, as well as directing the Village to permit him to erect a creche. On December 15, 2006, we issued an order granting plaintiff's motion for a preliminary injunction. Our order indicated that an opinion setting forth our legal reasoning would follow. This is that opinion. For the reasons set forth below, we conclude that plaintiff is entitled to a preliminary injunction because the Village's display violates the Establishment Clause.

## BACKGROUND

The following facts are not disputed by the parties and are adopted by the Court as its factual findings. Within the Village there is located a seven-acre public park, named "Law Park" (the

---

[1] Surprisingly, plaintiff did not, in his Complaint, allege a violation of the First Amendment's Establishment Clause. Nevertheless, virtually all of the conference time before this Court was devoted to oral argument on whether the Village's conduct constituted an improper governmental endorsement of one specific religious denomination at the expense of another, including the relevant United States Supreme Court and Second Circuit Establishment Clause jurisprudence.

1

"Park"), which contains several recreational facilities, including a swimming pool, tennis courts, a playground and a pavilion.    (Complt. ¶ 9.)  The Park abuts the Village's main roadway.    In celebration of the winter holiday season, the Village has erected a nine-foot menorah[2] adjacent to the roadway.    The menorah is also located next to a naturally-growing, coniferous tree standing approximately twelve feet high.    (*See* Order to Show Cause, Exs. A, B and C.)  Although the tree is lighted after dark, no lights are obvious during daylight hours.    (*Id.*)  No other seasonal displays are evident.    Plaintiff, a Roman Catholic, petitioned the Village to allow him to erect a creche[3] in the

---

[2] "Menorah" is the Hebrew word for "candelabrum."  *County of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 584 n.13 (1989).  The celebration of Chanukah serves as a

> commemoration of an event that occurred during the rededication of the Temple.  The Temple housed a seven-branch menorah, which was to be kept burning continuously. . . .  When the Maccabees rededicated the Temple, they had only enough oil to last for one day.  But, according to the Talmud, the oil miraculously lasted for eight days (the length of time it took to obtain additional oil). . . .  To celebrate and publicly proclaim this miracle, the Talmud prescribes that it is a mitzvah (*i.e.*, a religious deed or commandment) . . . for Jews to place a lamp with eight lights just outside the entrance to their homes or in a front window during the eight days of Chanukah. . . . Where practicality or safety from persecution so requires, the lamp may be placed in a window or inside the home.  The Talmud also ordains certain blessings to be recited each night of Chanukah before lighting the lamp.  One such benediction has been translated into English as: "We are blessing God who has sanctified us and commanded us with mitzvot and has told us to light the candles of Hanukkah."

*Id.* at 584 (citations omitted; internal quotation marks omitted).

[3] A creche is, of course, a depiction of the birth of Jesus in a manger in Bethelem, as described in the Gospels of Matthew and Luke, often including representations of Mary, Joseph, shepherds, angels and various domestic animals.  *See, e.g.*, Luke 2:8-16 (King James) ("And there were in the same country shepherds abiding in the field, keeping watch over their flock by night. And, lo, the angel of the Lord came upon them, and the glory of the Lord shone round about them: and they were sore afraid.  And the angel said unto them, Fear not: for, behold, I bring you good tidings of great joy, which shall be to all people.  For unto you is born this day in the city of David a Saviour, which is Christ the Lord.  And this shall be a sign unto you; Ye shall find the babe wrapped in swaddling clothes, lying in a manger.  And suddenly there was with the angel a multitude of the heavenly host praising God, and saying, Glory to God in the highest, and on earth peace, good

area of the menorah, which would remain in place until January 8, a day recognized by Roman Catholics as the end of the Christmas season.  The Village refused his request, stating that its policy is not to allow private, unattended displays in the Park.[4]  (Complt. ¶¶ 25-28.) Plaintiff subsequently sought injunctive relief in this Court.

## DISCUSSION

### I.   Plaintiff's Standing to Challenge the Village's Actions

We first address defendants' argument that plaintiff lacks standing to bring the instant action because he has not articulated an injury in fact caused by the Village's ordinance and decision prohibiting plaintiff from erecting a creche in Law Park.  The law is clear that "[a] plaintiff must allege personal injury [that is] fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *Allen v. Wright*, 468 U.S. 737, 751 (1984).  The alleged harm must be "'an invasion of a legally protected interest which is (a) concrete and particularized' ( *i.e.*, 'affect[ing] the plaintiff in a personal and individual way'); and '(b) actual or imminent, not "conjectural" or "hypothetical."'" *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 226 (2d Cir. 2006) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 561

_____

will toward men.  And it came to pass, as the angels were gone away from them into heaven, the shepherds said one to another, Let us now go even unto Bethlehem, and see this thing which is come to pass, which the Lord hath made known unto us.  And they came with haste, and found Mary, and Joseph, and the babe lying in a manger.").

[4] Plaintiff, in his Complaint, contends that the Village Code contains no such prohibition and that, therefore, he is entitled to erect his display.  Although the Village Code does not specifically prohibit the erection of displays by private individuals, it does state: "No person shall erect, post, carry or distribute any signs, flyers, posters or placards without written permission of the Recreation and Parks Department personnel."  CODE OF THE VILLAGE OF BRIARCLIFF MANOR § 153-4(N).  We agree with the Village that, by its terms, this provision extends to the erection of private holiday displays.

n.1 (1992)).  Put differently, "a plaintiff must demonstrate some specific present or future objective

harm that the challenged regulation has inflicted by deterring him from engaging in protected

activity."  *See id.* (quoting *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 170 (2d Cir.1999)).  "Thus,

whether a plaintiff has standing will 'depend[ ] considerably upon whether the plaintiff is himself

an object of the [government action] at issue,' and '[i]f he is, there is ordinarily little question that

the action . . .  has caused him injury.'"  *Id.* at 227 (quoting *Lujan*, 504 U.S. at 561-62).

Here, there is no doubt that plaintiff is the subject of adverse governmental action and that

he has been directly affected by the Village's ordinance and decision prohibiting him from erecting

a creche in the Park.  Defendants, in support of their argument, cite only Equal Protection cases that

deal with a passerby claiming that he or she was stigmatized by a public display.  While such

situations pose unique standing problems, they are simply inapposite to the present case.

Accordingly, we must address the merits of the action.

## II.     Appropriateness of Preliminary Injunctive Relief

In determining whether to grant a preliminary injunction that requires the government to take

affirmative action, *i.e.*, a mandatory injunction,[5] plaintiff must demonstrate he will suffer irreparable

_____

[5] "'A mandatory injunction . . . is said to alter the status quo *by commanding some positive act* . . . [and] thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success.'"  *Mastrovincenzo v. The City of N.Y.*, 435 F.3d 78, 89 (2d Cir. 2006) (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)).  In the present case, if we were to grant the requested relief, we would order the Village to remove the menorah from the Park or, alternatively, grant the application of plaintiff to erect at the Park a creche of size and prominence not inconsistent with those of the existing menorah.  Thus, we would be ordering the Village to alter the status quo and, therefore, plaintiff's request for a preliminary injunction is governed by the standards applicable to mandatory injunctions.  Moreover, this heightened standard is also required when the requested injunction: "(1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to [the] defendants on the merits

harm in the absence of the preliminary injunction and a "clear" or "substantial" likelihood of success on the merits. *Mastrovincenzo v. The City of N.Y.*, 435 F.3d 78, 89 (2d Cir. 2006). Defendants argue that plaintiff has failed to show any irreparable harm in the event that we were to deny his requested relief. We disagree. First, "[i]t is well settled that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury . . . ." *Id.* at 89 (internal quotation marks omitted). In any event, if we were to deny a preliminary injunction in the present case, plaintiff would effectively be without any remedy in light of the fact that a trial on the merits could not occur before the completion of the holiday season. *See* WRIGHT & MILLER, 11A FED. PRAC. & PROC. CIV. 2d § 2948.1 ("Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief."). Accordingly, we must consider whether plaintiff has demonstrated a clear or substantial likelihood of success on the merits.

### III.    Substantial Likelihood of Success on the Merits

### A.    Whether the Village's Policy of Prohibiting Private Individuals from Erecting Structures in the Park Violates the Free Speech Clause

We begin with plaintiff's contention that the Village's denial of his request to erect a creche in the Park constitutes impermissible content-based restriction of speech in violation of the First Amendment's Free Speech Clause. The Free Speech Clause provides: "Congress shall make no law

---

at trial." *Id.* at 90 (quoting *Tom Doherty Assocs.*, 60 F.3d at 34-35). The fact that the requested relief in the present motion is obviously limited to the holiday season, which would be prior to the completion of any trial in this case, provides another reason to apply the heightened standard to plaintiff's motion.

. . . abridging the freedom of speech"[6] and, accordingly, it is axiomatic that a governmental actor may not engage in content-based regulation of speech absent the most compelling justification. *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 648 (1981). On the other hand, it is also clearly established that "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired. . . . [Activities] protected by the First Amendment are subject to reasonable time, place, and manner restrictions." *Id.* at 647-48 (citations omitted; internal quotation marks omitted). "[P]arks, are considered, without more, to be public forums. . . . In such places, the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *United States v. Grace*, 461 U.S. 171, 177 (1983) (citations omitted; internal quotation marks omitted).

In the present case, the Village's ordinances prohibit the erection of *any* unattended privately-owned display within the Park. *See supra*, note 4. Clearly, such a scheme does not inquire into the nature of the display and is therefore content-neutral. Indeed, the Supreme Court has recognized that a governmental body may impose an outright ban on all unattended private displays in public parks. *See Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761 (1995) (stating that a ban on all unattended private displays in public parks constitutes a reasonable restriction on speech). The Village has a significant interest in maintaining its parks in an aesthetic and attractive condition by preventing clutter and potentially hazardous litter. *See Herschaft v. Bloomberg*, 70 F. App'x 26,

---

[6] The Free Speech Clause, along with the other clauses of the First Amendment, has been applied to the states through the Fourteenth Amendment's Due Process Clause. *See Deegan v. City of Ithaca*, 444 F.3d 135, 141 (2d Cir. 2006).

6

27-28 (2d Cir. 2003) ("[T]he City has a significant interest in its appearance and in preventing litter which can be created by signs of any size.").  Although displays such as signs and creches "are a form of expression protected by the Free Speech Clause, they pose distinctive problems that are subject to municipalities' police powers.  Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation."  *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994).  Even prior to its decision in *Pinette*, the United States Supreme Court permitted laws restricting the posting of signs where verbal communication remained unhindered.  *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984) ("In short, there is no constitutional impediment to the punishment of those who actually throw papers on the streets. . . .  A distributor of leaflets has no right simply to scatter his pamphlets in the air—or to toss large quantities of paper from the window of a tall building or a low flying airplane. Characterizing such an activity as a separate means of communication does not diminish the State's power to condemn it as a public nuisance. . . . With respect to signs posted by appellees, however, it is the tangible medium of expressing the message that has the adverse impact on the appearance of the landscape. . . .  [T]he substantive evil—visual blight—is not merely a possible byproduct of the activity, but is created by the medium of expression itself."). The constitutionality of such a policy is undeniable, and without restrictions like the one at issue herein, the Village's parks would be cluttered with all manner of signs and displays.

**B.**     **Whether the Village's Display Violates the Establishment Clause**

We now turn to the issue of whether the Village's display violates the Establishment Clause,

7

which provides that: "Congress shall make no law respecting an establishment of religion . . . ." U.S.

CONST. AMEND. I.  As the Supreme Court has long recognized, "[t]he language of the Religion

Clauses of the First Amendment is at best opaque, particularly when compared with other portions

of the Amendment." *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971).  Clearly, it means at least that

the government can neither establish a state church nor officially prefer or recognize one religion

over another.  *Larson v. Valente*, 456 U.S. 228, 244 (1982); *Skoros v. City of N.Y.*, 437 F.3d 1, 16

(2d Cir. 2006).  But in applying the Amendment to a specific public display, we must acknowledge,

as did the Second Circuit in *Skoros*, that courts "confront a jurisprudence of minutiae that leaves

them to rely on little more than intuition and a tape measure to ensure the constitutionality of holiday

displays."  *Skoros*, 437 F.3d at 15.

> We begin with the Supreme Court's decision in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).

In *Lemon*, the Supreme Court addressed not state-sponsored holiday displays, but the

constitutionality of Pennsylvania and New Jersey laws providing economic support to parochial

schools.  *Id*. at 606.  Nevertheless, it set forth a familiar three-part test for evaluating Establishment

Clause issues.  *Id*. at 612-13.  In order to pass constitutional muster, the challenged action must: (1)

have a secular purpose; (2) have a principal effect that neither advances nor inhibits religion; and (3)

"not foster an excessive government entanglement with religion." *Id*.  Although frequently criticized,

the *Lemon* test has never been overruled and remains controlling today.  *Peck v. Baldwinsville Cent.*

*Sch. Dist.*, 426 F.3d 617, 634 (2d Cir. 2005) ("In [the Second Circuit] . . . the Supreme Court's

Lemon test continues to govern . . . analysis of Establishment Clause claims.").

> Thirteen years later, in *Lynch v. Donnelly*, 465 U.S. 668 (1984), the Supreme Court first

addressed the inclusion of religious symbols in municipal holiday displays.  The display at issue in

8

*Lynch* featured numerous holiday decorations, "including, among other things, a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, a large banner that read[] 'SEASONS GREETINGS,' and [a] creche . . . ." *Id*. at 671.  Applying the *Lemon* test, the Lynch Court first determined that, in the aforementioned context, the creche was displayed to further a legitimate secular purpose: "to celebrate [Christmas] and to depict the origins of that Holiday." *Id*. at 681.  Analogizing to its prior cases upholding "federal grants for college buildings of church-sponsored institutions of higher education combining secular and religious education[,] . . . noncategorical grants to church-sponsored colleges and universities[,] . . . tax exemptions for church properties[,] . . . Sunday Closing Laws . . . and . . . legislative prayers," the Court further concluded that inclusion of the creche in the holiday display did not have a principal effect of advancing religion.  *Id*. at 682 (citations omitted; internal quotation marks omitted).  Rather, "[w]hat was said about the legislative prayers in *Marsh* [*v. Chambers*, 463 U.S. 783, 792 (1983)], and implied about the Sunday Closing Laws in *McGowan* [*v. Maryland*, 366 U.S. 420, 442 (1961)], [was] true of the city's inclusion of the creche: its 'reason or effect merely happens to coincide or harmonize with the tenets of some . . . religions.'" *Id*. at 683.  Finally, the Court held that the display did not amount to excessive government entanglement in religion, as the physical display itself was of *de minimus* value, required almost no upkeep and was not created or displayed in consultation with a religious authority.  *Id*. at 684.

Subsequently, in *Allegheny*, 492 U.S. at 573, the Court addressed whether two separate governmental displays violated the Establishment Clause.  Five members of the Court concluded that the display of a creche on the Grand Staircase of a courthouse constituted an impermissible

endorsement of religion in violation of the Establishment Clause, noting that, unlike in *Lynch*, the creche stood alone, without other symbols to detract from its obvious religious significance. *Id*. at 598. Six justices agreed that the display of a 45-foot Christmas tree in proximity to an 18-foot Chanukah menorah and a sign saluting liberty, at the entrance to a government building did not violate the Establishment Clause. *Id.* at 610-13. The six justices, however, could not agree on a majority opinion, and four opinions were published.

Justice Blackmun concluded that the inclusion of a menorah in an otherwise secular display did not render the display religious in nature, stating:

> The 45-foot tree occupies the central position beneath the middle archway in front of the Grant Street entrance to the City-County Building; the 18-foot menorah is positioned to one side. Given this configuration, it is much more sensible to interpret the meaning of the menorah in light of the tree, rather than vice versa. In the shadow of the tree, the menorah is readily understood as simply a recognition that Christmas is not the only traditional way of observing the winter-holiday season. In these circumstances, then, the combination of the tree and the menorah communicates, not a simultaneous endorsement of both the Christian and Jewish faiths, but instead, a secular celebration of Christmas coupled with an acknowledgment of Chanukah as a contemporaneous alternative tradition.

*Id*. at 617-18. Justice Blackmun also noted that, unlike Christmas, which is characterized by a plethora of secular symbols and figures, the only reasonable representation of Chanukah was a menorah.[7] *Id.* at 618. Justice O'Connor, who also concluded that the Christmas tree and menorah display was constitutionally permissible, based her assessment on the fact that a "reasonable observer," taking the exhibit as a whole, would perceive it as a secular display. *Id.* at 635-37. Justice O'Connor specifically disavowed Justice Blackmun's alternative secular symbol inquiry, stating:

---

[7] Justice Blackmun specifically noted: "An 18-foot dreidel would look out of place and might be interpreted by some as mocking the celebration of Chanukah." *Allegheny*, 492 U.S. at 618.

>My conclusion does not depend on whether or not the city had a more secular alternative symbol of Chanukah . . . just as the Court's decision in *Lynch* clearly did not turn on whether the city . . . could have conveyed its tribute to the Christmas holiday season by using a less religious alternative to the creche symbol in its display of traditional holiday symbols.

*Id*. at 636.  Finally, Justice Kennedy, joined by Chief Justice Rehnquist and Justices White and Scalia, concluded that both displays were constitutional, stating that, when considered in light of the holiday season, "[t]here [was] no realistic risk that the creche and the menorah represent[ed] an effort to proselytize or are otherwise the first step down the road to an establishment of religion."  *Id.* at 664.

Plaintiff, at oral argument, relied heavily on *Pinette*, 515 U.S. at 753.  In *Pinette*, the Court addressed whether the city of Cleveland, Ohio (the "City") could permit, numerous unattended displays at a public park—some religious in nature, but deny the Ku Klux Klan's application to erect a cross at the location.  The issue in *Pinette* was whether the City's prohibition of the Klan's cross was necessary to facilitate the compelling governmental interest of complying with the Establishment Clause.  *Id.* at 761. The Court disagreed with the City's contention that the Establishment Clause prohibited it from authorizing the Klan's private display, but could not agree on a majority opinion.  Ultimately, seven justices concluded that, under the circumstances, the display of a religious symbol by a private entity did not constitute an improper governmental endorsement of religion, even when that display was made on government property.  *See id.* at 770 (plurality opinion by Scalia, J., joined by Rehnquist, C.J. and Kennedy and Thomas JJ.) (declining to engage in endorsement analysis in a case of neutral treatment of private religious speech); *id*. at 779-80 (Thomas, J. concurring) (stating that the Klan's erection of the cross was a political act, rather than a religious one); *id*. at 782-83 (O'Connor, J., concurring, joined by Souter and Breyer,

11

JJ.) (concluding that, under all the circumstances, a reasonable observer would not have taken the cross to be a governmental endorsement of Christianity); *id*. at 785-87 (Souter, J. concurring, joined by O'Connor and Breyer, JJ.) (agreeing with Justice O'Connor, but placing greater emphasis on a sign disclaiming government support for the display).

Thus, under *Pinette*, the Village could, consistent with the Establishment Clause, permit plaintiff to erect a creche to balance the publicly erected menorah. The question remains whether the Village's display of a purely religious symbol of one faith, without permitting a privately sponsored symbol of any other faith, would violate the Establishment Clause.

As the Second Circuit has instructed, our analysis of the second prong of the *Lemon* test, namely, whether government conduct constitutes endorsement of religion, is guided by the "reasonable observer" standard applied in Justices Souter and O'Connor's concurring opinions in *Pinette*. *See Elewski v. City of Syracuse*, 123 F.3d 51, 53 (2d Cir. 1997) ("Establishment Clause caselaw applies a highly fact-specific test to government-sponsored creches: Would a reasonable observer of the display in its particular context perceive a message of governmental endorsement or sponsorship of religion?"); *Creatore v. Town of Trumbull*, 68 F.3d 59, 61 (2d Cir. 1995) ("Since the outcome of Capitol Square turned on the factors articulated by Justices O'Connor and Souter, we believe that the lower courts must be guided by their concurring opinions."). However, because the Village's erection of the menorah involves public speech, this part of our analysis requires closer attention to *Lemon* and *Allegheny* than to *Pinette*.

In this case, the first of the three prongs of the *Lemon* test—a secular purpose for the display—is clearly satisfied. *Cf. Lynch*, 465 U.S. at 680 ("The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has

12

concluded there was no question that the statute or activity was motivated wholly by religious considerations.").  Holiday decorations in municipal parks are almost universally used to create a festive atmosphere and, not incidentally, to remind shoppers that the gift-giving season is approaching.  It is surely not to promote religion that local merchants decorate their stores and chambers of commerce contribute financial support to such public displays.  Defendant Michael Blau, as well as Elsie Smith, a trustee of the Village, submitted affidavits stating that the menorah was added to the roadside display as part of a comprehensive holiday program, including caroling and the placement of wreaths on light poles, (Blau Aff. ¶¶ 14-24), in order to celebrate religious diversity and demonstrate that people of all faiths were welcome in the Village.  (Smith Aff. ¶¶ 1-6.) We have no reason to doubt the sincerity of this admirable goal.

Turning to the second prong of the *Lemon* test, namely, whether the challenged conduct has the effect of advancing religion, 403 U.S. at 612-13, we first note that "[t]he touchstone for our analysis is the principle that the First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."  *McCreary County v. Am. Civil Liberties Union*, 545 U.S. 844, ___, 125 S. Ct. 2722, 2733 (2005).  "To be sure, given its generality as a principle, an appeal to neutrality alone cannot possibly lay every issue to rest, or tell us what issues on the margins are substantial enough for constitutional significance . . . .  But invoking neutrality is a prudent way of keeping sight of something the Framers of the First Amendment thought important."  *Id*. at 2743 (citations omitted; internal quotation marks omitted).

"When applied to holiday display challenges, this analysis is highly fact-specific, asking: 'Would a reasonable observer of the display in its particular context perceive a message of governmental endorsement or sponsorship of religion?'" *Skoros v. City of N.Y.*, 437 F.3d 1, 29 (2d

13

Cir. 2006) (citations omitted; internal quotation marks omitted).    "As Justice O'Connor, the principal architect of the endorsement test, explained in *Allegheny*, the concept of endorsement is not limited to government coercion or efforts at proselytization; it is intended to take account of the numerous more subtle ways that government can show favoritism to particular beliefs . . . ."  *Id.* at 29 (internal quotation marks omitted).  Indeed, the display of a lone religious symbol on public property could lead an observer "to think that adherence to [the] religion was relevant to standing in the political community."  *Kaplan v. City of Burlington*, 891 F.2d 1024, 1030 (2d Cir. 1989) (internal quotation marks omitted).

Clearly, upon observing the Village's display during daylight hours, a reasonable observer could not help but sense the selective approval of one specific religion: Judaism.  The presence of the menorah—a well recognized religious symbol, *see County of Allegheny*, 492 U.S. at 613 (Blackmun, J., announcing the judgment of the Court); *id.* at 633 (O'Connor, J., concurring in part and concurring in the judgment); *id.* at 643 (Brennan, J., joined by Marshall and Stevens, JJ. concurring in part and dissenting in part); *see also  Kaplan*, 891 F.2d at 1026 ("A menorah is a religious symbol of the Jewish faith, and is recognized as such by the general public.")—adjacent to an unlighted, seemingly unadorned evergreen tree can convey no other message.  Unlike the *Allegheny* or *Lynch* displays, wherein secular symbols and structures dominated the display, the present display is dominated by religious iconography, without a neutralizing, secular background.  *Cf. Elewski*, 123 F.3d at 55 (display of creche in close proximity to large Christmas tree and privately-owned menorah display did not violate Establishment Clause).  Moreover, even to the extent that the evergreen tree is recognizable as a Christmas tree, it still is distinguishable from the *Allegheny* display, in which a 45-foot tree—a secular symbol—temporarily erected in the entryway

14

to a building overshadowed the menorah.  In the present case, conversely, the menorah is nearly as tall as the tree.  Additionally, the present tree is a naturally-growing, permanent fixture that is lighted only at night, rendering it even less conspicuous as a holiday display.

Finally, we address whether the Village's display fosters excessive government entanglement with religion.  The Supreme Court has acknowledged that, to some degree, entanglement of church and state is inevitable.  *See Agostini v. Felton*, 521 U.S. 203, 233 (1997).  In evaluating whether church-state entanglement is excessive, the Court has "looked to the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority. . . . Similarly, [the Court has] assessed a law's effect by examining the character of the institutions benefitted . . . and the nature of the aid that the State provided . . . ." *Id*. at 232 (citations omitted; internal quotation marks omitted).

As previously stated, the inclusion of a prominent Jewish religious symbol in a Village display to the exclusion of other religious iconography certainly appears to the reasonable observer as an official endorsement of Judaism.  Nevertheless, this is not a case where the Village has become involved in the affairs of a religious organization or provided funding or services to a church or parochial school.  The only benefit conferred upon any faith or religious organization is that of having its symbol of choice displayed to the public.  Although not insignificant, such a benefit does not rise to the level of excessive entanglement with religion.  *Compare Agostini*, 521 U.S. at 203 (holding that federal program wherein government employees taught classes in sectarian schools constituted impermissible entanglement between church and state); *Lemon*, 403 U.S. at 602 (Pennsylvania statute providing state funding for parochial schools violated Establishment Clause) *with Bowen v. Kendrick*, 487 U.S. 589, 615-17 (1988) (no excessive entanglement where

government monitored and reviewed adolescent counseling program set up by religious institutions that have received federal grants); *Roemer v. Bd. of Pub. Works of Md.*, 426 U.S. 736, 764-65 (1976) (no excessive entanglement where state conducted annual audits to ensure that state grants to religious colleges were not used to teach religion); *Hunt v. McNair*, 413 U.S. 734, 749 (1973) (issuance of government bond to parochial school did not constitute excessive entanglement with religion where school was primarily a secular educational institution). For the reasons stated above, the Village's practice fails the second prong of the *Lemon* test and therefore violates the First Amendment's Establishment Clause. *See Bollenbach v. Bd. of Educ. Of Monroe-Waterbury Cent. Sch. Dist.*, 659 F. Supp. 1450, 1465 (S.D.N.Y. 1987) (failure of one part of *Lemon* test renders challenged action unconstitutional).

## CONCLUSION

There is no doubt that defendant Village Board of Trustees Briarcliff Manor (the "Board"), in voting to erect a lighted menorah at Law Park during the holiday season, acted with the admirable motive of recognizing the diversity of religious belief in the community by displaying a symbol of one of the principal religions that undergird this nation's moral character and conscience. Unfortunately, their selection of only one religion for such recognition creates an unavoidable impression of favoritism and endorsement. As the Board's own Advisory Committee counseled it, the safest course of action in decorating public spaces for the holiday season was to omit purely religious symbols altogether. When the Board disregarded that advice, it assumed the obligation of displaying religious iconography in a neutral manner—that is, it was required to display, or at least permit others to display, the religious symbols of other faiths in the community with equal prominence. It has failed to satisfy that obligation, as the large, lighted menorah is universally

16

recognized as a religious symbol of the Jewish faith.  Such a symbol would be welcomed if, unlike in the present case, it were balanced by religious symbols of other faiths.  The nearby, naturally-growing evergreen tree, decorated with lights during the ecumenical holiday season, is clearly a secular symbol of that season and not a symbol of any particular faith.  By denying plaintiff's application to erect, at private expense, a creche or other religious symbol, defendant Village of Briarcliff Manor maintained the imbalance caused by its erection of the menorah and created, in the mind of a reasonable observer, the impression of selective endorsement of the Jewish Faith.

Dated: White Plains, New York
      December 20, 2007

William C. Conner
Sr. United States District Judge

17